**UNITED STATES of America**

v.

**Henry Chukwunedu ACHIEKWELU.**

Crim. No. 95–0376–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 16, 1995.

Helen F. Fahey, United States Attorney, Alexandria, VA, Nicole M. Healy, Trial Attorney, Patrick M. Donley, Trial Attorney, Fraud Section, Criminal Division, United States Department of Justice, Washington, D.C., for U.S.

Robert Stanley Powell, Arlington, Virginia, for defendant.

### *AMENDED SENTENCING MEMORANDUM* [1]

ELLIS, District Judge.

#### Introduction

In September 1994, defendant Henry Achiekwelu and two fellow Nigerian nationals, Johnnie Okolie and Fred Kachi, were indicted for nine counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. The wire fraud was committed in connection with a complex, international scheme to defraud Dr. Jai Gupta, a McLean, Virginia resident, of more than $4.2 million. Okolie and Kachi were never apprehended and remain fugitives, living in Nigeria where extradition efforts have thus far failed. Defendant, on the other hand, was apprehended in Switzerland and extradited to this District, where in April 1995 he was tried by a jury and convicted on all nine counts of wire fraud.

At the initial sentencing hearing, the Court, *sua sponte*, noted that the unusual and aggravated facts of this case warranted consideration of an upward departure under the Guidelines. *See* 18 U.S.C. § 3553. Specifically, the Court directed the government and the Probation Officer to consider whether an upward departure on any ground was warranted in this case. Accordingly, the sentencing was continued to give the parties an opportunity to explore any bases for an upward departure. Ultimately, the government and the Probation Officer recommended departing upward on a variety of grounds. The government also urged a two-level upward adjustment pursuant to U.S.S.G. § 2F1.1(b)(3)(A) on the ground that defendant falsely represented himself to be a representative of a foreign government. Defendant responded by opposing this two-level upward adjustment and all grounds for an upward departure, claiming instead that he

---

1. The original Sentencing Memorandum, dated September 20, 1995, indicated that defendant had testified at trial and professed his innocence. In fact, defendant chose to assert his constitutional privilege not to testify at his trial, and this amended memorandum correctly reflects that fact.

was entitled to a two-level credit for acceptance of responsibility notwithstanding his not guilty plea. This sentencing memorandum records the Court's rulings on these issues and sets forth the sentence ultimately imposed on defendant.

## I

The fraud scheme defendant and his coconspirators concocted and carried out is as bizarre as it is complex. So bizarre, indeed, that one reading the record is likely to believe that it is the plot of a picaresque novel, rather than the true story of avarice, evil and criminality that it is.

The story begins in September 1992, when Gupta received a letter from a man in Nigeria whom he had never heard of named Chief Johnny Okolie. The letter offered Gupta a business opportunity. Okolie said in his letter that he had received Gupta's name, and that of Gupta's company, EER Systems, from the Chamber of Commerce in Lagos, Nigeria. Okolie went on in the letter to say that he represented Macbos Holdings, which he claimed had installed lighting at Maiduguri Airport in Nigeria for the Nigerian Ministry of Civil Aviation in 1982. Okolie said that the government had not paid the $28.5 million due on this contract because it claimed Macbos had over-billed the Ministry. Okolie explained further that now the Nigerian government had agreed to pay $18.5 million and later the remaining $10 million. Okolie also related that Macbos wanted to send that money to a bank account outside Nigeria and was looking for someone trustworthy to whom he could send the money. In this regard, Okolie said Macbos wished to send the $18.5 million to Gupta and EER in the United States, in return for which Okolie offered to Gupta 15 percent commission on the $28.5 million. Finally, the letter noted that if Gupta was interested in the deal, Okolie would invite him to Nigeria to meet with the officers of Macbos. Gupta promptly wrote back to Okolie and told him he was interested in learning more about his offer. Thereafter, Gupta communicated with Okolie by phone and by fax letters throughout September and early October 1992.

In mid-October 1992, at Okolie's request, Gupta agreed to go to Lagos to close the deal. Okolie first required EER to provide him with what he called a "proforma invoice", for which he provided a model. This invoice would supposedly charge the Nigerian Ministry of Civil Aviation for $18.5 million worth of lighting at the Maiduguri Airport. Despite the fact that EER never did any work for any Nigerian government agency, Gupta directed an employee to make up an invoice. Gupta then sent the false invoice off to Okolie's company, Jones Ventures, on October 7, 1992. Although the false invoice referenced a payment of $18.5 million, Gupta understood from Okolie that EER would ultimately be sent a total of $28.5 million, with a first phase payment of $18.5 million, followed by a second phase payment of $10 million, for which Gupta would receive a commission of more than $4.27 million.

On October 18, 1992, Gupta went to Nigeria and met Okolie in person. The first night Gupta was there, Okolie took him to a private home of Fred Kachi. Okolie introduced Gupta to Kachi and to defendant, who was represented to be a deputy governor at the Central Bank of Nigeria and a consultant to the Nigerian Ministry of Finance. The Nigerians talked with Gupta about the transfer of the $28.5 million to EER's bank account in Virginia. Kachi and defendant told Gupta that, after meeting him, they trusted him, and they would have the Central Bank of Nigeria transfer the money.

The second day of his stay in Nigeria, Gupta went to dinner with Kachi and Okolie. Kachi showed him a document that appeared to be from the Central Bank of Nigeria. Gupta was told it was an authorization to pay the $28.5 million to EER. Okolie and Kachi also told him, however, that before the money could be deposited into EER's account, Gupta had to pay, in advance, a 2.5 percent income tax on the $28.5 million or $712,500 to the Nigerian government. Gupta agreed to do so.

On approximately the fourth day of Gupta's stay in Lagos, Okolie and defendant took Gupta to a plain, unmarked office building, which they told him was the Central Bank of Nigeria. They parked in a multi-story ga-

rage next to the building and walked in. There were no security guards inside, and no signs identified the building. Inside the building, Okolie, defendant and Gupta entered an office with a large desk and a conference table. Behind the desk was a man whom Gupta was told was Rasheed Williams, a Central Bank of Nigeria official. Williams greeted them and said, "Congratulations, your money's been approved. However, what have you done about the taxes?" Okolie and defendant told Williams that Gupta would pay the taxes. Williams then told Gupta that the money was at Bankers Trust in New York awaiting Williams' instruction to transfer it to EER's account. As soon as the taxes were paid, and a receipt was presented to the Central Bank of Nigeria, he said the money would be transferred to EER's account. Williams also told Gupta that the Central Bank of Nigeria could only wire transfer money on Thursdays, so to get the money that week, Gupta would have to pay the tax immediately.

Following the meeting with Williams, Gupta arranged to pay the taxes. Defendant provided Gupta with the bank transfer information and Gupta then called and faxed EER's controller, Pramod Gupte, directing him to wire transfer $712,500 to Midas Merchant Bank in Lagos. At trial, Gupta testified that he wired this money to Lagos through the Australia and New Zealand Bank in London.

Gupta planned to leave Lagos, Nigeria on Saturday, October 23, 1992, but the money to pay the taxes still had not arrived by that Friday. To ensure that the taxes would be paid, he authorized the bank to give the money to defendant, so that defendant could make the tax payment. Gupta and defendant went to Midas Merchant Bank. Gupta signed some papers authorizing defendant to receive the money, and the manager took their photographs. As planned, Gupta flew back to Virginia on Saturday, October 23, 1992.

After returning to Virginia, Gupta spoke with defendant and Kachi. During one of these telephone conversations, Kachi and defendant told Gupta that they had paid the taxes. On October 27, 1992, Gupta received what appeared to be a notice from the Central Bank of Nigeria "confirming that the bank had been notified of the advance tax payment, and that the full $28.5 million would be transferred to EER System's account at Signet Bank as soon as the Central Bank of Nigeria received a document called the "certificate of completion". That same day, October 27, after receiving the faxed notice, Gupta spoke to defendant and Kachi by phone. Defendant and Kachi told Gupta that the Central Bank of Nigeria required the "certificate of completion" before it would agree to release the money. They also said Gupta would have to provide an additional $1.1 million to pay some unidentified subcontractors in order to finalize the "certificate of completion." That night, Gupta received a fax directing him to send $1.1 million to American Express Bank in London, to be credited to defendant at Midas Merchant Bank in Lagos.

Two days later, on October 29, 1992, Gupta received a letter signed by both defendant and Kachi who asked to borrow the $1.1 million from EER. As an incentive, defendant and Kachi promised to reimburse the money in a week, and offered Gupta a bonus of $2.2 million. Defendant and Kachi also promised that, if the project did not materialize within 60 days, they would pay Gupta back at 12 percent interest. Gupta readily accepted this proposal and instructed Pramod Gupte to send the $1.1 million on November 2, 1992.

Between November 2 and November 12, 1992, Kachi and defendant told Gupta he needed to provide them with yet an additional sum of $500,000 for Kachi's boss, supposedly the governor of the Central Bank of Nigeria, to obtain a "release order" so the $28.5 million could be transferred to EER. Gupta again agreed and instructed Pramod Gupte to send the $500,000 on November 13, 1992. Also on that day, Gupta received a three-page fax letter purporting to be from the Central Bank of Nigeria, indicating that Gupta had complied with all the necessary conditions and that the $28.5 million would be sent soon. The second page appeared to be Nigerian tax receipt for the 2.5 percent tax. The third page was a letter from Kachi and

defendant which stated they needed $500,-000; $480,000 for Kachi's boss and $20,000 for his secretary.

By this time, defendant and Kachi had begun to tell Gupta that, if he failed to keep sending money as requested, he would not only never get the $28.5 million they promised, but they would not refund the money he had already paid. On December 4, 1992, after defendant requested $206,000, Gupta attempted to have Pramod Gupte wire transfer the money to defendant at Pacific Merchants Bank in Lagos. Gupta learned from defendant that the transfer was not completed, so, on December 8, 1992, he sent another $206,000. That transfer arrived in Nigeria, but owing to the confusion over the first transfer, on December 17, 1992, Gupta sent $206,000 to defendant at Continental Merchants Bank in Lagos. After the second $206,000 made it to Nigeria, defendant told Gupta that he had overpaid by $200,000, and defendant promised to bring that money with him when he came to Virginia.

On December 17, 1992, Gupta received a letter signed by Rasheed Williams, the supposed Central Bank of Nigeria official whom Gupta had met in Lagos. In the letter Williams said that after learning from "Dr. Henry" that they needed help, Williams would transfer the $28.5 million to EER Systems' account if EER sent another $500,000 by December 30, 1992, to defendant at American Express Bank in London. Gupta had Pramod Gupte send the $500,000 that day.

In January 1993, defendant traveled to London. Gupta talked with him there many times by telephone about the transfer from the Central Bank of Nigeria to EER's account. Defendant claimed the money was not in Bankers Trust in New York anymore, but would be coming from Barclays Bank in London. Defendant promised that he would personally supervise the wire transfer to EER. Before leaving Lagos, defendant called Gupta and asked him to send the $500,000 to a bank account in London. On January 15, Gupta had Pramod Gupte send the $500,000 to the account of someone named Andy Tayo Ayeni at Midland Bank in London, as defendant requested. Gupta also spoke to someone else in London, a man who called himself Frederick Jackson and who said he was an officer at Barclays Bank. Jackson refused to give Gupta his phone number or business address, but he reassured him that the money would soon be sent to Virginia.

On January 28, Gupta received a letter by fax from Lagos signed by both Kachi and defendant, promising that if Gupta did not receive the $28.5 million, they would personally guarantee the refund of all the money they had collected from EER. In the same letter, they directed Gupta to send another $450,000 to Fred Osuju at Century Bank in Beverly Hills, California. Gupta had Pramod Gupte send the money that day.

Gupta and Pramod Gupte testified at trial that, throughout the period from September 1992 until March 1993, EER sent approximately $4.4 million ($4,174,530 actually transferred plus the $206,000 that never arrived in Nigeria) to accounts in Nigeria, England and California. During that same period, Gupta and EER never received any money from Nigeria, or from anyone connected with defendant in any way. In February 1993, Gupta was contacted by a Virginia State Police Officer, Vernon Fay, acting on behalf of Interpol. After talking to Officer Fay, Gupta reported to the United States government that he believed he had been defrauded.

It appears that Gupta was not this group's only target. At trial, the government presented the testimony of Richard Hart, a businessman who lives in California. Hart testified that in 1994, he and his company, Xenotech, Inc., a lighting supply company, were defrauded of over $400,000 by defendant and others, through promises and representations similar to those made to Gupta. More specifically, Hart testified that he met defendant in London in March 1994. Hart testified that when he met defendant in London, defendant used the name "Dr. Raymond Belogun." Hart further testified that he met defendant in London following a contact initiated by a Nigerian individual named Prince Chukwudi Okolo. Okolo, it seems, made essentially the same promises and representations to Hart that Chief Okolie had made to Gupta a year earlier. Based on those promises, Hart arranged to meet with an organi-

zation called the "Nigerian Federal Debt Reconciliation Committee" in London during March 1994. Hart said that defendant, and eight other men with whom he met in London, identified themselves as members of the Debt Reconciliation Committee. These men told Hart that he would receive $40.5 million from the over-billed Maiduguri Airport contract, once he provided certain documents to the committee, including the certificate of completion Gupta was required to produce. After leaving the Debt Reconciliation Committee meeting, Hart called Prince Okolo in Nigeria. Okolo advised Hart to pay $100,000 to Balogun and to provide two gold watches, one for Balogun (the defendant) and one for the chairman of the committee.

Hart testified that he had his company wire transfer the money to England. He then went to Harrods and purchased two gold Rolex watches for $26,000. In his hotel room, he presented defendant with the cash (in pounds sterling) and the two watches. Later, Hart faxed a letter to Prince Okolo in Nigeria. While faxing the letter, he observed that the screen on his fax machine displayed the fax number for the "Central Bank of Nigeria." When Hart called Okolo to question him, Okolo told Hart that he had no explanation and that Hart should resend the letter. Hart did so using the same fax number, and observed that the screen displayed Okolo's fax number. At trial Hart testified that, despite paying out over $400,-000, he never received any money from Nigeria.[2]

Of the approximately $4.4 million fraudulently obtained from Gupta, defendant claims to have personally received only $600,000. The rest of the funds, he claims, went to Okolie, Kachi and others. Finally, he claims he used $210,000 of the money to purchase a London flat, $230,000 to purchase a home in Nigeria, and $91,000 he placed in a Nigerian

Bank account. The rest he says was used to operate his businesses. None of these amounts have been recovered, except defendant has offered to deed his London flat to Gupta as partial restitution. Also, in December 1994, while defendant was in jail in Switzerland, defendant's wife was detained by the British police while travelling from London to Geneva to visit defendant. During this incident the British police discovered defendant's wife was carrying approximately $60,-000 in currency, which they seized from her. Defendant has released any claim he might have to this money so that it may also be used for further partial restitution to Gupta.

### A. Uncontested Matters:

With the exception of the disputes over (i) the two-level acceptance of responsibility credit pursuant to U.S.S.G. § 3E1.1, (ii) a two-level increase for purporting to be a government official pursuant to U.S.S.G. § 2F1.1(b)(3)(A), and (iii) an upward departure pursuant to U.S.S.G. § 5K2.0, the parties had no objection to the Presentence Investigation Report ("PSIR"). Accordingly, with the exception of those matters, the Court adopts the findings and conclusions of the PSIR as its findings and conclusions in this sentencing proceeding.

### B. Contested Matters:

Defendant argues that he is entitled to a reduction of his criminal offense level for his acceptance of responsibility pursuant to § 3E1.1(a). That provision allows for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a).[3] The defendant bears the burden of proving his eligibility for that reduction. *United States v. Urrego–Linares*, 879 F.2d 1234, 1239 (4th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989). Defen-

---

**2.** Defendant was never prosecuted for this fraud, apparently because such a prosecution would have been barred by settled extradition law. Thus, defendant was extradited from Switzerland solely on the basis of the fraud perpetrated on Gupta. At the time of the extradition, the investigation of the fraud on Hart had not matured to the point of indictment. And Article IX of the Extradition Treaty between the United States and Switzerland prohibits prosecution of extradited persons for crimes not the subject of the extradition.

**3.** Subsection (b) of U.S.S.G. § 3E1.1 permits a further decrease of one level under certain circumstances not applicable here. Defendant has not sought a reduction pursuant to this subsection.

dant argues that his conduct after trial manifests his acceptance of responsibility for his offense. He identified some of his assets, including his flat in London and the location of several bank accounts containing modest sums, and provided the true identity of his two accomplices named in the indictment.

Typically, the acceptance of responsibility reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." Application Note 2, U.S.S.G. § 3E1.1. But this is not an inflexible rule. As the Note recognizes, the reduction may apply "[i]n rare situations ... even though [the defendant] exercises his constitutional right to a trial." Id. Such situations include those "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." Id.

This case is not one of those "rare situations." Defendant went to trial not to preserve rights but to assert innocence and deny the government's case. Indeed, all of the actions on which defendant relies in his argument for a reduction, namely his post-trial cooperation, occurred after he entered a not guilty plea, went to trial, and was convicted. And it appears his post-trial assistance to the government has been minimal. Although he has provided what he claims to be the true names of his accomplices Kachi and Okolie, the value of that information is doubtful, even assuming the information is truthful. The government has amended its extradition requests for those two individuals to include the names provided by defendant, but in light of Nigeria's traditional reluctance to extradite to the United States a defendant charged with fraud, defendant's information is unlikely to result in bringing his cohorts to justice. Defendant has also provided some information concerning his assets, but as it turns out, very little more beyond that already known by the government. Already disclosed in the government's investigation was the existence of the London flat and the London and Swiss bank accounts. Accord-

ingly, the defendant's objection to the PSIR for failing to recommend a reduction for acceptance of responsibility is **OVERRULED.**

■ For its part, the government seeks an offense level enhancement pursuant to U.S.S.G. § 2F1.1(b)(3)(A) on the ground that defendant misrepresented himself as acting on behalf of a government agency. That provision allows for a two-level increase if "the offense ... involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." U.S.S.G. § 2F1.1(b)(3)(A). The defendant and his accomplices deceived Gupta by pretending to be affiliated with Nigerian government agencies, including taking Gupta to what he was led to believe was an office of the Central Bank of Nigeria, a government agency. The schemers provided Gupta with documents purporting to be actual records of the Central Bank of Nigeria. Gupta testified that the defendant represented that he was associated in some way with the Nigerian Ministry of Finance.

■ These misrepresentations appear to fall squarely within the plain language of the provision, namely that the offense "involved a misrepresentation that the defendant was acting on behalf of ... a government agency." Id. Yet, the provision's language is not wholly free from ambiguity, for it does not make clear whether the enhancement applies to foreign as well as to domestic governments. Neither the Guidelines themselves nor the related commentary directly address this issue. Decisional authority is similarly silent on this point. To resolve this ambiguity it is appropriate to consider the purpose of the enhancement and then to resolve the ambiguity in a manner consistent with the provision's rationale or purpose. See United States v. Roberts, 39 F.3d 10 (1st Cir.1994).

■ The apparent rationale for the provision is that misrepresentations of this nature erode the trust in government officials, a trust that is ultimately vital to society's survival. Confirmation of this appears in the background to § 2F1.1(b)(3), which states that "defendants who exploit victims' charitable impulses or trust in government create

particular social harm."[4] Victims of fraud by persons claiming to act on behalf of a government are likely to mistrust legitimate government agents in the future, thereby damaging government's effectiveness. To be sure, this harm is most direct to the United States when the perpetrators of fraud purport to be agents of this country. But it is also true that this type of fraud has a corrosive effect on people's trust in government generally.

Because, therefore, the conduct in this case comes within the plain language of § 2F1.1(b)(3)(A) and a consideration of the purpose behind the enhancement also indicates that it applies to the conduct at issue here, the Court finds that defendant's criminal offense level should be increased by two levels.

## C. *Conclusions:*

Given the disposition of the contested matters, the Guidelines calculations applicable to defendant, prior to resolution of the departure motions, are as follows:

1. Defendant's adjusted offense level is 23.

2. Defendant's total offense level is 23.

3. Defendant's criminal history category is I.

4. The range of punishment under the Guidelines is 46 to 57 months with no more than one year of supervised release.

5. The Guidelines range of fines is $10,000 to $100,000. An additional statutory special assessment of $50 applies to each felony count. 18 U.S.C. § 3013(a)(2)(A).

6. Probation is not authorized.

## D. *Motions for Departure:*

■ The government has moved for an upward departure from the sentencing on the grounds of (i) an enhancement in offense level pursuant to U.S.S.G. § 5K2.0 based on the exceptional complexity of defendant's scheme, a factor not adequately taken into consideration by the Sentencing Commission, and (ii) an upward adjustment of criminal history category pursuant to U.S.S.G. § 4A1.3, on the ground that defendant's criminal history category does not take into account other unprosecuted criminal behavior.

The exceptional complexity of defendant's scheme to defraud Gupta is evident. Defendant and his cohorts lured their victim to Nigeria, introduced him to several others purporting to be government officials and took him to an office building that they claimed to be the Central Bank of Nigeria. They prepared false documents that appeared to be official Nigerian government certificates and arranged for all money to be sent to foreign countries where it would be more difficult for American law enforcement officials to locate.

Defendant contends that the complexity of his crime was already taken into account when his offense level was increased by two levels to reflect that his crime involved "more than minimal planning" pursuant to § 2F1.1(b)(2)(A). But the Guidelines plainly recognize that this enhancement may be too anemic in some cases. Thus the Guidelines allow for an upward departure "even though the reason for the departure is taken into consideration in the guidelines ... if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." U.S.S.G. § 5K2.0. Specifically, a court may depart upward on the basis of the complexity of the fraud scheme if its complexity is "substantially in excess" of the complexity of the heartland of fraud cases even if it has already applied the two-level increase for more than minimal planning. *See United States v. Davidson,* 984 F.2d 651, 654–55 (5th Cir.1993) (departing upward because of complexity even though the more-than-minimal-planning increase had already been applied). This precisely describes the instant case, for the intricate stratagems devised by defendant and others in this case take it outside the realm

---

4. The Background also makes clear that the seriousness of this fraudulent conduct is not mitigated by the fact that the fraud was facilitated by the victim's avarice. There can be no claim, therefore, that the seriousness of defendant's fraud is somehow mitigated by Gupta's evident avarice and willingness to participate in a fraud on the Nigerian government.

of typical wire fraud schemes, such that the Court finds that the case manifestly involves "aggravating ... circumstance(s) of a kind ... [and] to a degree not adequately taken into consideration" in the Guidelines. U.S.S.G. § 5K2.0. Accordingly, the Court concludes that it is appropriate to depart upward two offense levels. And this two-level increase is applied in the alternative to the increase imposed on defendant for purporting to be a government agent. Thus, defendant's criminal offense level is 23—calculated by adding two levels to his adjusted offense level of 21—on the basis either of his falsely representing himself as a government official pursuant to § 2F1.1(b)(3) or the complexity of the fraud pursuant to § 5K2.0.

■ The Court also finds it appropriate to depart upward in the defendant's criminal history category. In considering an upward departure under U.S.S.G. § 4A1.3(e), courts may consider reliable "prior similar adult criminal conduct not resulting in a conviction" in ascertaining whether the criminal history category adequately reflects the seriousness of the defendant's past criminal conduct. As the record discloses, Gupta was not defendant's sole fraud victim. In addition to defrauding Gupta, defendant, through an essentially similar scheme, obtained approximately $100,000 and two Rolex watches from Richard Hart. The Court concludes that defendant's criminal history category of I "significantly under-represents the seriousness of the defendant's criminal history." U.S.S.G. § 4A1.3. Had defendant been prosecuted for the fraud perpetrated on Hart he would very likely have been convicted. And in that event, his criminal history would now be II rather than I.

For all these reasons and for the reasons stated from the bench, the Court departs upward two (2) offense levels pursuant to § 5K2.0, which, when applied alternatively to the two-level increase pursuant to § 2F1.1(b)(3)(A), results in a total offense level of 23. In addition, the Court departs upward to criminal history category II, pursuant to § 4A1.3(e). As a result, the applicable sentencing range is 51 to 63 months imprisonment.

### E. *Sentence Imposed:*

The Court commits defendant to the custody of the Bureau of Prisons for a period of fifty-one (51) months.[5] Credit is to be given for time already served in connection with this case.

Upon release from confinement, defendant is to serve a period of one (1) year of supervised release. As a special condition of supervised release, the Court orders defendant to pay restitution in the amount of $600,000 to Dr. Gupta, EER Systems Corporation, according to a payment schedule to be set by the Probation Office. As a further condition, defendant is to cooperate with the Immigration and Naturalization Service in the event they initiate deportation proceedings against him.

The Court imposes a $50 special assessment as to each count for a total of $450. 18 U.S.C. § 3013(a)(2)(A).

The Court additionally imposes a punitive fine of $15,000 to be paid to the U.S. government, but declines to impose an additional fine to cover the costs of incarceration or supervised release.

### F. *Statement of Reasons for the Court's Sentence:*

The sentence imposed adequately satisfies the Guidelines' goals relating to deterrence, retribution, and incapacitation. A lesser sentence—one imposed within the original Guidelines range without an upward departure—would not have satisfied these goals.

The Court further **ORDERS** that this Sentencing Memorandum be appended to, and

---

5. This sentence is independently supportable on the basis of each of the two grounds for an upward departure. If the departure were based only on the complexity of the scheme, defendant would have an offense level of 23 and a criminal history categorization of I, yielding a range of 46 to 57 months. Conversely, if the departure were based only on the enhanced criminal history category, defendant would have an offense level of 21 and a criminal history categorization of II, also yielding a range of 46 to 57 months. In either event, the Court would impose a sentence on defendant of 51 months of incarceration.

made a part of, the PSIR, pursuant to Rule 32(c)(3)(D), Fed.R.Crim.P.

Copies of this Sentencing Memorandum shall be issued to all counsel of record, the Probation Office, the U.S. Marshal's Service, and the General Counsel of the Immigration and Naturalization Service.[6]

---

6. The Sentencing Memorandum was prepared prior to and at the time of sentencing but was not completed and signed until today's date for reasons unrelated to the sentencing.