HARLINGTON WOOD, Jr., Circuit Judge.
 

 The single issue in this appeal of defendant’s fraud convictions is whether the district court erred in applying U.S. Sentencing Commission Guideline § 2F1.1(b)(3)(A) to the conduct with which the defendant, Roberto Ferrera, was charged and to which he pled guilty.
 
 [1]
 
 That guideline application resulted in a sentence enhancement of two points.
 

 Because of its unusual factual background, however, this is not just another routine appeal of a sentencing guideline issue. Judge Marovieh, at sentencing, expressed the view that, “[Tjhere are aspects of this like the Over-the-Hill Gang,” commenting further, “and what amazes me is that there are people out there that these guys can con.”
 
 [2]
 
 We will sketch the unusual factual circumstances which prompted that assessment.
 

 BACKGROUND
 

 In his plea agreement Ferrera admitted his role in three related frauds. In the first of the three schemes, he and his co-defendant, Paid W. Graffia, fraudulently obtained $1.5 million in an advance fee scheme from a woman named Huei-Li-Chen. However, that fraud does not figure in this appeal. Instead, this appeal is the result of Ferrera’s participation in two other frauds. We’ll look at those two schemes, the facts of which are largely undisputed.
 

 A.
 
 Scheme Number 1
 

 In 1991 Graffia arranged for the printing of $11 billion (not million) in promissory notes purporting to be guaranteed by the Mexican government. Graffia delivered these false and counterfeit notes to Ferrera at Chicago’s O’Hare International Airport. The notes were arranged in five series of $2.2 billion each. Each series purportedly was issued by one of five different Mexican banks. Ferrera took the notes to Mexico to have them signed by various Mexican officials to add a touch of authenticity to their . falseness. For that obliging accommodation, those Mexican officials were later imprisoned.
 

 Ferrera returned some of those series of notes to Graffia, but he also retained some for himself and stored them in Mexico City. Then both Ferrera and Graffia began preparing and planning other details of their frauds which they thought would appeal to unsuspecting investors.
 

 Ferrera and Graffia agreed to use two corporations they owned, American Credit Corporation (“ACC”)
 
 [3]
 
 and Union International Bank and Trust, Ltd. (“Union International”), to facilitate their frauds. Neither corporation had any physical facilities other than the residences of Ferrera and Graffia. Those involved fully appreciated that these two corporations were worthless. To remedy these deficiencies, the defendants disseminated false financial information representing that the corporations were worth untold millions. Union International, which they claimed to be a bank but was not, had been incorporated under the laws of Granada, an island which is a part of the Windward Islands, lying just off the coast of Venezuela. Ferrera and another co-defendant purchased this foreign shell corporation for just under $30,000 from a California corporation that specialized in off-shore corporations which pretended to be banks. The defendants used
 
 *-1044
 
 a letterhead showing Union International’s headquarters as a location in Mexico City. In reality, that location was one of Ferrera’s homes. Sometimes he also lived in Los An-geles.
 

 Ferrera claimed the titles of Vice President and Chairman of the Board of ACC, and President and Chairman of the Board of Union International. Graffia, an Illinois resident, held some impressive titles in the two corporations as well. What other corporate titles were left over were divided between the other co-defendants.
 

 About the middle of 1991, both the Mexican government and the FBI somehow heard of the schemes and advised the defendants that the Mexican government had neither authorized nor guaranteed their notes. That official notification could not have surprised any of them. The early interest of the FBI and the government of Mexico may have been enough, however, to temporarily discourage the defendants, for it appears that none of the notes were circulated.
 

 B.
 
 Scheme Number 2
 

 Their fraudulent ideas, however, were too innovative to abandon, and besides, it would have been a shame to waste so many perfectly good worthless notes. Therefore, about the middle of 1993, they tried it again. This time Ferrera assigned and delivered some of the Mexican notes to an associate in Lexington, Kentucky who owned Five Star Investments, Ltd. Those notes had a false face value of $600 million. In October the associate delivered about $400 million of those notes to J.B. Sanchez, a New York broker. Sanchez, however, wisely checked and found out from the FBI that the notes were frauds. He agreed to cooperate with the Bureau, and did.
 

 In November 1993 Ferrera again contacted Sanchez to follow up on the progress of the fraud. This time Sanchez pretended to represent two corporations both interested in acquiring the notes to use as collateral for a multimillion dollar bank loan. Although Ferrera had floated some of his false claims previously, here, the story gets more interesting. In a series of telephone conversations, Ferrera advised Sanchez that the notes actually belonged to the President of Mexico and that he, Ferrera, was a close associate of the President and working for him and the government of Mexico in regard to the notes. Apparently not sure that that additional false information would be sufficient, he also falsely claimed to be a major general (two stars) in the Mexican Army. Ferrera enlisted one of his other co-defendants, but promoted him only to the rank of colonel. Likewise, Ferr-era represented himself to be a member of the Executive Committee of PRI, the ruling political party of Mexico.
 

 After further negotiations with Sanchez, Ferrera agreed to assign the notes, then temporarily in Sanchez’s possession, over to Sanchez’s supposed client. For his valuable financial services, Ferrera was to receive the modest sum of about $1.5 million per month for one year. To close this good deal Ferr-era went to New York. There he met Sanchez and Sanchez’s claimed banker-client, an undercover FBI agent. At the meeting an unsuspecting Ferrera assigned the notes to the client. Encouraged by his success, Ferr-era agreed to provide them with $500 million additional notes on demand to be used for some other large loan they might choose to promote. To facilitate this arrangement, Ferrera agreed to pay the FBI agent-banker a $10 million bribe. As soon as the parties completed all of these financial arrangements, Ferrera was arrested.
 

 DISCUSSION
 

 Out of all of this fraudulent activity, only a sentencing issue survives. Ferrera contends that the district court erred in giving him a two-level increase in his offense level under Guideline § 2F1.1(b)(3)(A). That Guideline, which applies to offenses involving fraud and counterfeiting of foreign securities, permits a two-level increase if the offense involves “a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization or a government agency.” U.S.S.G. § 2F1.1(b)(3)(A).
 

 The first three categories — charitable, educational or religious — have no conceivable connection to the facts of this ease. There
 
 *-1043
 
 fore, if those three categories were exclusive, the enhancement could not apply. However, the Guideline also lists political organizations and government agencies as categories of organizations on behalf of which a defendant may not misrepresent his authority to act. On that basis, the district court found the Guideline applicable to Ferrera.
 

 In arguing that Guideline § 2Fl.l(b)(S)(A) does not apply to him, Ferr-era leans heavily on the Commentary to the Guidelines. In interpreting or explaining the Sentencing Guidelines, the Commentary is authoritative unless it violates the Constitution, a federal statute, or is inconsistent with or a plainly erroneous reading of the Guidelines.
 
 Stinson v. United States,
 
 508 U.S. 36, 38, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).
 

 Application Note 4, which Ferrera cites, gives three examples of conduct which Guideline § 2F1.1(b)(3)(A) encompasses: (1) those defendants who solicit contributions to a non-existent famine relief organization by mail; (2) defendants who divert donations for a religiously affiliated school by telephone solicitations to church members in which the defendants falsely claim to be fundraisers for the school; and (3) defendants who pose as federal collection agents to collect delinquent student loans. U.S.S.G. § 2F1.1, comment. (n.4). However, the commentators could not have intended these examples to be exhaustive, and as a practical matter, these examples could not be exhaustive, as the devious mind would easily escape that limited net. Indeed, the Background to the Commentary initially makes clear that the “guideline is designed to apply to a wide variety of fraud cases.” U.S.S.G. § 2F1.1, comment, (baekg’d). Likewise, Application Note 4 does not suggest that the short list of examples is all-inclusive. Rather, it states that
 
 “Examples
 
 of conduct to which this factor applies
 
 would
 
 include_”
 
 Id.
 
 at comment, (n.4) (emphasis added);
 
 see United States v. Frazier,
 
 53 F.3d 1105, 1117 (10th Cir.1995) (Baldock, J. dissenting) (“Far from expressing any intent to narrow the scope of the plain language of § 2Fl.l(b)(3)(A), application note 4 states that the three listed examples represent merely a few of many that would fall within the scope, of the guideline_”) Moreover, reading the list as exhaustive would render the Application Note clearly inconsistent with the Guideline. There are five categories in the Guideline ranging from charitable, educational and religious to political organizations and government agencies, but the Application Note give's only the three examples mentioned above to cover the five different categories.
 

 Ferrera also cites the Background Commentary stating that the enhancement is for those defendants who “use false pretenses to take advantage of a victim’s trust in government, or law enforcement agencies, or their generosity and charitable motives.” U.S.S.G. § 2F1.1, comment, (baekg’d). This portion of the Commentary explains that these motivations are sufficient to impose greater punishment because of the “social harm” they cause. Id.
 

 Ferrera brought himself and his co-defendants within the scope of the Guideline, Background and Application Notes by claiming to be on the Executive Committee of the Mexican ruling party, by claiming to be a major general in the Mexican Army, and by claiming to be working on the project for the Mexican government at the direction of his close friend, the President of Mexico. The notes themselves on their face displayed the fictitious guarantee of the government of Mexico. The victims were looking for a safe way to make money. Ferrera and his co-defendants represented that they had the backing of the Mexican government to make their offer seem safer. That the victims may have been motivated, in part, by self-interest does not mitigate the seriousness of Ferr-era’s conduct. U.S.S.G. § 2F1.1, comment, (backg’d);
 
 United States v. Achiekwelu,
 
 900 F.Supp. 812, 819 n. 4 (E.D.Va.1995). Likewise, that the victims may not have wholeheartedly believed Ferrera’s representations and sought independent verification does not mitigate the seriousness of Ferrera’s conduct. Rather, the focus of our inquiry must be on the defendant’s motivation for making the prohibited misrepresentation. Ferrera’s scheme was an obvious effort to trade on the victims’ trust in the integrity of the govern
 
 *-1042
 
 ment and being a fraud, therefore, it was likely to lessen confidence in the government.
 

 Thwarting legitimate charitable purposes and undermining confidence in the government are different evils, but each evil causes the “social harm” that the Guideline seeks to deter. Therefore, causing this social harm does not require actions that combine all the charitable, educational, religious, political and government claims. Actions involving any one of the categories are capable of causing the social harm and, therefore, qualify for the enhancement.
 

 Ferrera argues that
 
 United States v. Frazier,
 
 53 F.3d 1105, 1113-15 (10th Cir.1995), imposes a narrow restriction on the enhancement provision. He cites that part of the opinion which is a concurrence by two of the judges, taking the view that the hypothetieals we have already discussed “demonstrate that the purview of the guidelines is narrower than that which may be discerned from a literal reading of the guideline.”
 
 Frazier,
 
 53 F.3d at 1113. However,
 
 Frazier
 
 is of no aid to Ferrera. Even if we were to adopt the
 
 Frazier
 
 court’s narrow interpretation of the Guideline, the Guideline would still apply to Ferrera. The
 
 Frazier
 
 court reasoned that the Background and Commentary limited application of the Guideline to defendants who
 
 falsely
 
 represent that they have authority to act
 
 on
 
 behalf
 
 of
 
 a charitable, religious, educational or political organization or a government agency.
 
 Id.
 
 Applying this reasoning, the
 
 Frazier
 
 court reversed the defendant’s sentence because he, in fact, was an officer of the organization involved and had the authority to act but had misused the funds intended for the organization.
 
 Id.
 
 Ferrera, on the other hand, had no authority whatsoever from the government or the ruling political party to act on its behalf, nor did he have any authority to act on behalf of the army in which he claimed to be a high-ranking officer. Therefore, the
 
 Frazier
 
 court’s limitation would not affect Ferrera’s eligibility for the enhancement.
 

 Ferrera also argues that language later in the concurrence further limits the application of the Guideline. He cites a portion of the opinion stating that the defendant also was not eligible for the enhancement because he did not “exploit the ‘generosity’ and ‘charitable motives’ of his victim.... ”
 
 Frazier,
 
 53 F.3d at 1114. However, that portion of the opinion is dicta, distinguishing
 
 Frazier from United States v. Marcum,
 
 16 F.3d 599 (4th Cir.1994), a ease in which the Fourth Circuit applied the Guideline to the head of another charitable organization who diverted a portion of the charitable donations he received for his own use. The
 
 Frazier
 
 court reasoned that even under
 
 Marcum,
 
 the defendant would not be eligible for the enhancement because the “aggravating circumstances” which existed in
 
 Marcum,
 
 one of which was exploitation of the victims’ generosity, did not exist in
 
 Frazier. Frazier,
 
 53 F.3d at 1114. On the other hand, earlier in the opinion, while explaining its limitation on the Guideline, the
 
 Frazier
 
 court stated that the Guideline applies to “exploitative conduct which induces the victims to act upon their charitable
 
 or trusting
 
 impulses due to the defendant’s misrepresentation....”
 
 Id.
 
 at 1113 (emphasis added). Under these circumstances, the portion of
 
 Frazier
 
 which Ferrera cites does not appear to be an attempt to read out of the Commentary the unambiguous language stating that the Guideline applies to “defendants who take advantage of victims’ trust in government or law enforcement agencies
 
 or
 
 their generosity and charitable motives.” U.S.S.G. § 2F1.1, comment, (backg’d) (emphasis added).
 
 [4]
 

 Ferrera also cites to
 
 United States v. Marcum,
 
 16 F.3d 599 (4th Cir.1994), in an effort to show that courts applying the Guideline apply it only to defendants who exploit their
 
 *-1041
 
 victims’ charitable impulses. However,
 
 Mar-cum
 
 involved a defendant who was the chairman of a charitable organization and misappropriated a portion of the organization’s donations. Therefore, the Fourth Circuit’s failure to refer to the “taking advantage of the victims’ trust in government” language in the Guideline Commentary does not suggest that the Fourth Circuit intended to read that language out of the Guideline. Rather, a more plausible interpretation is that the Fourth Circuit did not refer to this portion of the Commentary because it did not apply to the facts of the ease.
 

 As we have stated above, both the
 
 Frazier
 
 and the
 
 Marcum
 
 courts considered § 2Fl.l(b)(3)(A)’s applicability to defendants who misrepresented their authority to act on behalf of charitable organizations. As such, these eases involved conduct that exploited the charitable nature of their victims. Likewise, because the defendants did not misrepresent their authority to act on behalf of a government agency, these cases obviously did not involve conduct that undermined the victims’ trust in government. Under these circumstances, we will not interpret either court’s findings that the defendants exploited the victims’ charitable nature as an attempt to impose a requirement that defendants who exploit their victims’ trust in government also must exploit their victims’ charitable impulses to be eligible for the enhancement. However, to the extent those courts would amalgamate all the categories and require the taking advantage of the victims’ charitable or generous motive in all the separate categories — charitable, religious, educational, political and government agency — we would respectfully decline to follow those eases.
 

 The government cites
 
 United States v. Echevarria,
 
 33 F.3d 175, 179-80 (2d Cir. 1994), in which the defendant posed as a state physician;
 
 United States v. Hall,
 
 996 F.2d 284, 285-87 (11th Cir.1993), in which the defendant posed as a tax collector;
 
 United States v. Bakhtiari,
 
 913 F.2d 1053, 1063 (2d Cir.1990), in which the defendant posed as a State Department official for a personal reason; and
 
 United States v. Achiekwelu,
 
 900 F.Supp. 812, 818-19 (E.D.Va.1995), in which the defendant posed as a Nigerian government official in an advance fee scheme, as examples of cases in which courts applied the Guideline to defendants who misrepresented their authority to act on behalf of a government agency without exploiting their victims’ charitable impulses. Those cases are more in line with our approach to the problem, but none compare with the extreme factual circumstances in the present ease. Ferrera clearly is entitled to the enhancement stated in the Guideline, and its applicability is not limited by the Commentary, as Ferrera argues.
 

 As to Ferrera’s additional claim that he was a retired major general in the Mexican Army, we see no way it advances his claim or justifies his trying to separate victims from their money. We have implicitly rejected
 
 Frazier’s
 
 reasoning limiting applicability of the Guideline to defendants who have no actual authority to act on behalf of the organization involved.
 
 See United States v. Lilly,
 
 37 F.3d 1222 (7th Cir.1994) (applying the enhancement to a church pastor who converted church funds for his own use). Therefore, whether or not Ferrera was a member of the Mexican ruling party or an officer in the Mexican army is irrelevant to his eligibility for the enhancement in this circuit.
 

 However, we note that the district judge commented that he “couldn’t picture [Ferr-era] as a Mexican General even if you sat him on a white horse.” We are dubious about that one finding. Mexican cavalry officers have ranked as some of the best horsemen in the world. People of the United States have gone to Mexico for horsemanship instruction by former Mexican cavalrymen. Putting someone on a good horse, not necessarily even a white one, can help present a much more impressive figure than might otherwise be possible if that person were just standing on the ground. To the extent the court’s observation about horses might be in error, we view it as harmless.
 

 Affirmed.
 

 [1]
 

 .Ferrera pled guilty to one count of conspiracy in violation of 18 U.S.C. § 371, three counts of wire fraud in violation of 18 U.S.C. § 1343, and two counts of counterfeiting foreign securities in violation of 18 U.S.C. § 478. He was sentenced to seventy-one months imprisonment followed by three years supervised release.
 

 [2]
 

 . The other co-defendants are not involved in this appeal.
 

 [3]
 

 . Ferrera changed the name to Illinois American Credit Corporation, but that did not improve its worth.
 

 [4]
 

 . Furthermore, the mitigating circumstances which distinguished
 
 Frazier
 
 from
 
 Marcum
 
 are not present here. The
 
 Frazier
 
 court noted that the Guideline should not be applicable because the defendant did not
 
 solicit
 
 funds from the public. Rather, he merely misappropriated government funds which had been previously allocated to the charitable organization.
 
 Frazier,
 
 53 F.3d at 1114. The court also noted that, unlike the defendant in
 
 Marcum,
 
 the defendant in
 
 Frazier
 
 did not commit the fraud to serve his personal interest.
 
 Id.
 
 Here, Ferrera’s fraud targeted the public rather than a government agency and involved money which had not been previously allocated to Ferrera. Likewise, Ferrera attempted to perpetrate the fraud solely to benefit himself and his co-defendants.