[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 11, 2006
THOMAS K. KAHN
CLERK

No. 04-12339
_____

D.C. Docket No. 02-80107-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SERDAR KALAYCIOGLU,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(December 11, 2006)**

Before TJOFLAT and CARNES, Circuit Judges, and HODGES,[*] District Judge.

HODGES, District Judge:

---

*Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

Defendant Serdar Kalaycioglu appeals his conviction following a jury verdict of guilty on eleven counts of wire fraud, 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud, 18 U.S.C. § 371. Kalaycioglu also appeals his sentence of 324 months imprisonment plus an order to pay $6,722,592.29 in restitution. We affirm the conviction and the sentence.

**Facts and Background**

Kalaycioglu is a naturalized Canadian citizen, a resident of Canada, and an employee of the Canadian Space Agency. He holds a Ph.D. in Engineering, specializing in space robotics and satellite technologies.

According to the superseding indictment and the evidence at trial, from May 2000 to September 2001, Kalaycioglu defrauded residents of Broward and Palm Beach Counties, Florida, by obtaining investment of funds from them on the basis of a false representation, among others, that he was one of only seven traders in the world who was approved and licensed by the United States Federal Reserve to engage in the trading of bank instruments that yielded a very high rate of return. The superseding indictment further alleged, and the evidence proved, that Kalaycioglu became the Chairman of the Board and Chief Executive Officer of Meridian Investment Bank, Ltd. (the "Bank"), an offshore bank licensed in Grenada with its principal place of business in St. George's, Grenada, West Indies, and then

2

fraudulently induced others to invest money with him and the Bank by falsely representing that they would receive a high rate of return on their investment. With regard to the charge of conspiracy to commit wire fraud, the evidence established that Kalaycioglu (and his co-defendants who entered pleas of guilty) conspired to pay a $10,000,000 kickback to an undercover FBI agent posing as a corrupt securities trader for a fictitious foreign-based mutual fund, and to pay other cooperating witnesses, who posed as corrupt stock promoters, in exchange for the fund's purchase of $40,000,000 in certificates of deposit issued by the Bank.

At trial, the Government presented evidence that Kalaycioglu held himself out to be a highly successful investment trader in monetary instruments that he described, among other things, as "medium term notes," letters of credit, guarantees, and CDs from "prime banks." Kalaycioglu represented that his unique knowledge and ability to trade in these monetary instruments allowed him to offer potential investors high yield investment programs ("HYIPs"). Kalaycioglu explained that he was able to leverage comparably modest sums into huge bank instruments and was thereby able to receive large, risk-free returns on the original investment. Kalaycioglu's claims were bolstered by his purported affiliation with a Montreal law firm that supposedly held all the investor money in trust, thereby protecting the initial investment. Further, Kalaycioglu claimed to be engaged in investment trading for the Canadian

government and to have a mandate from the United States Federal Reserve and World Bank to invest in certain humanitarian programs. To support his claimed connections, Kalaycioglu often flashed his Canadian Space Agency identification and an American Express card issued to him by the Canadian government. Kalaycioglu also became involved with the Bank, a financially troubled institution, and then led its principals to believe that the Bank could be turned around through investment in his HYIPs. In return for his assistance, Kalaycioglu was appointed Chairman of the Board and Chief Executive Officer of the Bank.

With the help of numerous false documents, Kalaycioglu convinced several individuals to invest in his HYIPs. Due to his affiliation with the Bank, Kalaycioglu often persuaded these individuals to invest in his HYIPs by buying CDs issued by the Bank. Not surprisingly, the rates of return that Kalaycioglu promised never materialized. When individual investors complained, Kalaycioglu delayed by refunding portions of their money, but ultimately those victims lost substantial sums. Moreover, when the promised high rates of return did not occur, the Bank itself failed. Much of the money paid in by individual investors to purchase the Bank's CDs was funneled to Kalaycioglu through the Canadian law firm's attorney trust account.

The Government also presented evidence that in May 2001 co-defendant Mickelson met with an undercover FBI agent and two cooperating individuals (collectively the "UCs"), who stated to Mickelson that they were employed by a U.S. based representative of the Fund and were seeking high rates of investment return. Mickelson, attempting to secure an influx of cash to help the ailing Bank, told the UCs about the HYIPs touted by Kalaycioglu, as well as CDs they could purchase from the Bank that would allow the fictitious foreign based mutual fund to invest in Kalaycioglu's HYIPs. Following a series of telephone conversations involving Kalaycioglu and his co-defendants, the UCs agreed to have the Fund purchase $40 million of CDs issued by the Bank. In return, the UCs were to receive a $10 million kickback, which the UCs, Kalaycioglu and his co-defendants would deduct from the original $40 million investment and conceal the deduction from the Fund. Kalaycioglu also boldly suggested that the UCs invest their kickback in his HYIPs. When the UCs asked to see a copy of Kalaycioglu's Federal Reserve license, Kalaycioglu faxed them a copy of his Canadian Space Agency identification and his American Express card issued by the Canadian government. The UCs backed out of the deal before any money changed hands. According to the Government, and unbeknownst to his co-defendants, Kalaycioglu intended to cause a loss of the entire

5

$40 million because he would have funneled the remaining $30 million to himself rather than the Bank.

At the conclusion of trial the jury found Kalaycioglu guilty of eleven counts of substantive wire fraud offenses (18 U.S.C. § 1343) involving separate wire communications and transfers of funds originating in South Florida on specified dates in 2000-2001 as a result of the scheme to defraud. Kalaycioglu was also convicted of the conspiracy count,[1] but was acquitted of two of the substantive wire fraud charges. At sentencing the district court imposed an aggregate commitment term of 324 months and an order of restitution in the amount of $6,722,592.29.

**Issues**

On appeal, Kalaycioglu raises four issues, attacking both his conviction and his sentence. He contends that (1) the district court improperly admitted expert testimony, in violation of Federal Rules of Evidence 403 and 704(b), linking Kalaycioglu's conduct to characteristics of a fraudulent financial scheme; (2) the district court improperly instructed the jury on "honest services" fraud (18 U.S.C. §

---

[1] The alleged purpose and object of the conspiracy charged in Count 14 was to "deprive another of the intangible right of honest services," thereby invoking 18 U.S.C. § 1346; and the intended victim of the conspiracy was alleged to be the Fund which would be defrauded "through paying undisclosed kickbacks . . . to others in exchange for their causing the Fund to purchase a large amount of certificates of deposit" issued by Meridian Investment Bank. There was no substantive count relating to this alleged transaction, of course, and none of the other counts involve an allegation of "honest services" fraud under § 1346.

1346); (3) the district court erred in calculating the amount of loss for purposes of sentencing and restitution; and (4) the district court erred in applying a sentencing enhancement for Kalaycioglu's misrepresentation that he was acting on behalf of a government agency.

## Discussion

### A. The Expert Testimony of Herbert Biern

One of the witnesses at trial was the senior official in charge of the Federal Reserve's Division of Banking Supervision and Regulation, Herbert Biern, who was not involved in the investigation or apprehension of Kalaycioglu. Biern testified that in mid-1993 he began looking into HYIPs after receiving thousands of inquiries from the public seeking information about their legitimacy. Ultimately, Biern concluded that HYIPs were not legitimate investment vehicles, and he caused the Federal Reserve to issue worldwide warnings about them. Biern also testified that HYIPs do not exist as a legitimate means of earning high rates of returns; that the Federal Reserve does not license or register traders; and that the Federal Reserve does not mandate involvement in any humanitarian programs.

In his testimony, Biern identified what he described as the common characteristics of HYIPs, including: (1) abnormal confidentiality provisions; (2) reference to a limited number or category of banks (such as "prime" banks) that could

perform the investments; (3) unrealistically high rates of return; (4) trading a banking instrument over and over to achieve those returns during a specified period of time; (5) a minimum investment amount; (6) use of legitimate banking instruments in unconventional ways; (7) representations that the funds were safe because they were in an attorney's trust account or were protected by a letter of credit or bank guarantee; and (8) representations that government authorities such as the Federal Reserve, World Bank or International Monetary Fund were involved and that the profits had to be used for humanitarian projects. Biern further testified that he was never able to figure out how HYIPs were supposed to generate the extraordinary investment returns they promised, and that he had never seen anyone make any money through a HYIP.

Following his general testimony, Biern reviewed certain documentary evidence entered by the Government against Kalaycioglu. Biern testified, over objection, that the characteristics of HYIP schemes were present in the documents, but did not go so far as to state that Kalaycioglu's activities were fraudulent. Specifically, Biern examined documents related to a Letter of Credit transaction that Kalaycioglu entered into with Larry Schweiger, one of the alleged victims. Biern testified that the claimed 70% monthly returns in the Schweiger transaction were unrealistic, and that he had never seen a legitimate transaction with a monthly rate of return of 70%. Biern stated that it made no sense that a person could earn $291 million in forty weeks on an

initial investment of $10 million. In the documentation related to the Schweiger transaction, Biern also identified references to terms such as "prime" banks and "40 weeks" as hallmarks of HYIP scams.

Kalaycioglu argues that the admission of Biern's testimony violated Federal Rules of Evidence 704(b) and 403[2] because the witness described a criminal profile - the hallmarks of illegal HYIP scams - and then testified in detail about how Kalaycioglu fit this profile, providing substantive evidence of guilt. Kalaycioglu contends that Biern's testimony, if credited, would necessarily lead the jury to conclude that the expert believed Kalaycioglu's transactions were scams, and that Kalaycioglu had the requisite knowledge and intent to defraud. In response, the Government asserts that the expert testimony at issue here was proper evidence regarding the modus operandi of illegitimate high yield investment scams and enlightened the jury regarding common practices used in those complex fraudulent investment schemes.

---

[2] "District court rulings on the admissibility of expert testimony are subject to the abuse of discretion standard." United States v. Dulcio, 441 F.3d 1269, 1274 n.6 (11th Cir. 2006). "This standard of review requires that we defer to the district court's ruling unless it is manifestly erroneous." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).

Rule 704(b) provides that, "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

9

"Courts have condemned the use of profiles as substantive evidence of guilt, while acknowledging that there is a fine line between potentially improper profile evidence and accepted specialized testimony." United States v. Long, 328 F.3d 655, 665 (D.C. Cir. 2003) (quoting United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000), cert. denied 532 U.S. 1000, 121 S. Ct. 1666, 149 L. Ed. 2d 647 (2001) and United States v. McDonald, 933 F.2d 1519, 1521 (10th Cir. 1991)); see also United States v. Quigley, 890 F.2d 1019, 1022 (8th Cir. 1989) (holding that testimony of a drug courier profile was impermissibly introduced as substantive evidence of guilt); United States v. Hernandez-Cuartas, 717 F.2d 552, 555 (11th Cir. 1983) (in which a panel of this court criticized the use of drug smuggler profiles as substantive evidence of guilt, but affirmed the conviction where the subject testimony was used only as background evidence to explain why the defendant was initially stopped and searched by Custom Officials). Accord United States v. Chastain, 198 F.3d 1338, 1349 (11th Cir. 1999).

We believe the correct rule in this area was stated by the D. C. Circuit in Long, when the Court said:

> [E]xperts may testify regarding the modus operandi of a certain category of criminals where those criminals' behavior is not ordinarily familiar to the average layperson, as in the case of the modus operandi of persons involved in illegal drug trafficking or prostitution. Still, there is a line that expert witnesses may not cross. What is proscribed is questioning

that produces responses suggesting some special knowledge of the defendant's mental processes. This line relates to the limits of Rule 704(b) on opinion evidence regarding the ultimate issue. . . ."

328 F.3d at 666 (citations and quotations omitted).

Key to the Government's case against Kalaycioglu was the illegitimacy of HYIPs, as well as the way in which scams involving HYIPs operate. Thus, under the circumstances of this case, Biern provided highly relevant information directly related to complicated factual issues before the jury. His testimony first educated the jurors concerning the characteristics of HYIPs. Second, Biern described the hallmarks of the modus operandi of persons running a scam involving HYIPs. Third, Biern opined that certain documents related to transactions entered into between Kalaycioglu and his alleged victims contained the hallmarks of illegitimate HYIPs. Critically, however, while Biern described HYIPs as illegitimate, he did not testify that Kalaycioglu engaged in fraud, nor did he testify that a person promoting HYIPs was necessarily engaged in fraud. Indeed, Biern never suggested that he had any special knowledge of Kalaycioglu's mental processes. Moreover, the district court repeatedly gave the jury limiting instructions concerning Biern's testimony, directing them, for example, not to confuse his testimony concerning his background and experience investigating other HYIPs with the facts of this case.

11

We conclude that the district court properly exercised its discretion in admitting the testimony of Herbert Biern without running afoul of Federal Rule of Evidence 704(b), and also correctly concluded that the probative value of his testimony was not substantially outweighed by prejudicial effect. See Fed. R. Evid. 403.

### B. Jury Instruction on Honest Services Fraud

Kalaycioglu asserts that the district court committed reversible error when it refused a defense request and instead gave the jury, under 18 USC § 1346, the circuit pattern jury instruction on "honest services" fraud.[3] Kalaycioglu argues that the instruction as given is fatally flawed because it presumed as a matter of law the existence of a fiduciary duty owed by the supposed mutual fund representatives to the Fund, and did not require the jury to determine the factual nature and existence of such a duty as an essential element of the conspiracy offense.[4]

We find Kalaycioglu's argument unpersuasive for two reasons. First, it ignores the fact that Kalaycioglu and his coconspirators were not charged with a substantive offense involving honest services wire fraud in violation of 18 USC §§ 1343 and 1346; rather, they were charged under 18 USC § 371 with a conspiracy to commit

---

[3] Offense Instruction 51.2, Eleventh Circuit Pattern Jury Instructions (Criminal Cases) (2003).

[4] We review a district court's rulings on jury instructions for abuse of discretion. United States v. Chastain, 198 F.3d 1338, 1350 (11th Cir. 1999).

12

"honest services" wire fraud, and the actual existence of a fiduciary relationship was not an essential element of that offense. Indeed, the indictment obviously charged a conspiracy offense and not an "honest services" substantive offense precisely because the Fund did not in fact exist.

Second, while the cases suggest that the district court should ordinarily instruct the jury concerning the elements of the substantive offense or offenses constituting the object of an alleged conspiracy,[5] the district court's instructions in the circumstances of this case were clearly sufficient to meet that obligation.

In United States v. deVegter, 198 F.3d 1324 (11th Cir. 1999), we had occasion to review at length the history of honest services fraud as now embodied in 18 U.S.C. §1346 (which makes no mention at all of fiduciary duties).[6] We observed that in private sector honest services fraud cases, other circuits have held that "[t]he prosecution must prove that the employee intended to breach a fiduciary duty, and that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach." Id. at 1329. We also said,

---

[5] See United States v. Vaglica, 720 F.2d 388, 391 (5th Cir. 1983); United States v. Martinez, 496 F.2d 664, 669 (5th Cir. 1974). But see United States v. Threadgill, 172 F.3d 357, 367 & n.8 (5th Cir. 1999).

[6] In its entirety, 18 U.S.C. § 1346 simply states: "For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

13

in any event, that "[t]he nature and interpretation of the duty owed is a question of federal law," and ultimately concluded that it was unnecessary to decide in that instance "whether a fiduciary duty is necessary in §1346 private sector cases." Id. at 1330. We reach the same conclusion here. There can be no doubt as a matter of law that persons employed to seek out investment opportunities for a mutual fund owe a fiduciary duty to the fund, but whether or not proof of such a duty is a necessary element of an "honest services" wire fraud offense, the district court's instructions to

14

the jury, set out in the margin,[7] constituted a fully sufficient and correct charge concerning honest services fraud as an object of the conspiracy alleged in this case.

## C. Sentencing Issues

Kalaycioglu appeals his 324-month sentence and order to pay $6,722,592.29 in restitution. We review the district court's application of the Sentencing Guidelines de novo, while factual findings are reviewed for clear error. United States v. Crawford, 407 F.3d 1174, 1177-78 (11th Cir. 2005). Further, we review the district

---

[7]    Let me turn now, then, to the concept of depriving someone of the intangible right to the honest services. [sic.]

To deprive another of the intangible right of honest services means to violate or to cause an employee or agent of another person to violate the employee's or the agent's duty to provide honest services to the employer or the principal.

* * * *

Now, with regard to employers or principals in the private sector, the Government must prove that the employee or agent intended to breach a fiduciary duty, and that the employee slash agent foresaw or reasonably should have foreseen that the employer/principal might suffer an economic harm as a result of that breach.

Under the law every agent or employee representing or working for somebody else, that is, the employer, has a duty, it is called a fiduciary duty to act honestly and faithfully in all of his or her dealings with the employer and to transact business in the best interest of the employer, including a duty to make full and fair disclosure to the employer of any personal interest or profit or kickback the employee expects to derive or has derived from any transaction in which he or she participates in the course of their employment.

A kickback includes any kind of an undisclosed payment or reward to an employee for dealing in the course of employment with the person making the payment so that the employee's personal financial interest interferes with the employee's duty to secure the most favorable bargain for the employer. [Emphasis supplied].

15

court's factual findings as to the amount of restitution under the clearly erroneous standard. United States v. Bourne, 130 F.3d 1444, 1446 (11th Cir. 1997).

Kalaycioglu asserts (1) that the district court failed to apply the Guidelines correctly in calculating the loss attributable to him as over $40,000,000; (2) that the district court erred by ordering restitution on the basis of unreliable evidence; (3) that the district court erred in enhancing his sentence for misrepresenting that he worked on behalf of a government agency; and (4) that the district court committed constitutional error under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), because the court applied those Guidelines Sentencing enhancements by relying on facts not found by the jury.

*i. Loss Calculation*

We review for clear error a district court's determination of the amount of loss involved in an offense. United States v. Nostari-Shamloo, 255 F.3d 1290, 1291 (11th Cir. 2001). Under U.S.S.G. § 2F1.1(a) (2000), the base offense level for fraud is 6. If the loss exceeded $40,000,000, then the offense level is increased by 17 levels. U.S.S.G. § 2F1.1(b)(1)(R). "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1 comment. (n.8) (2000). "[O]ften the amount of loss caused

16

by fraud is difficult to determine accurately. Thus, courts may reasonably estimate that amount." United States v. Miller, 188 F.3d 1312, 1317 (11th Cir. 1999).

Kalaycioglu's co-defendants, who were affiliated with the Bank and were charged only with conspiracy to commit wire fraud, pled guilty to that charge and their plea agreements specified that the amount of loss resulting from their offense was more than $5,000,000, but less than $10,000,000. Kalaycioglu asserts that the district court violated principles of judicial estoppel in calculating the loss attributable to him as over $40,000,000. Although we have not previously addressed the applicability of judicial estoppel to facts like those of this case, the Seventh Circuit discussed a similar situation in United States v. Christian, 342 F.3d 744 (7th Cir. 2003). In that case, as a result of conduct originating from one incident, three defendants were charged with violations of 18 U.S.C. § 242, the offense of deprivation of rights under color of law which can be charged as a misdemeanor, or as a felony if bodily harm was involved. See id. at 747. Two of the defendants entered into plea agreements with the Government and pled guilty to the § 242 charge as a misdemeanor crime. The other defendant proceeded to trial and was convicted of the felony offense. On appeal, he argued that the Government should have been prevented, through the doctrine of judicial estoppel, from presenting evidence of bodily harm at his trial. Id. The Seventh Circuit rejected the defendant's argument

17

that the Government's plea agreement with the other defendants constituted an admission by the Government that no bodily injury had occurred, and concluded that judicial estoppel did not prevent the Government from introducing evidence that the defendant on trial committed bodily harm as part of the offense. See id. at 749. The Court further explained that, in reaching a plea agreement with a defendant, the Government can offer a plea to a lesser charge or drop certain offenses from the indictment. Id. at 748 (noting that a "court must find that the facts support the charge; the facts may prove more than what is charged but not less"). As a result, the Seventh Circuit concluded that judicial estoppel did not restrict the Government's presentation of evidence at trial that the defendant committed a more serious offense than the one to which his codefendants had pled guilty. See id. at 748-49.

Kalaycioglu has offered no authority to demonstrate that the doctrine of judicial estoppel prevented the district court from attributing a loss to him that was higher than the loss the court attributed to his co-defendants. Here, the plea agreement into which the Government entered with Kalaycioglu's co-defendants did not constitute an admission by the Government as to the amount of loss attributable to Kalaycioglu. See Christian, 342 F.3d at 747-49. The Government was not bound to argue to the district court that the amount of loss attributable to Kalaycioglu was identical to that attributable to his co-defendants. See id. Furthermore, there was

18

evidence presented at trial that Kalaycioglu represented that he could place a proposed $40,000,000 investment into his high-yield trading programs, which did not actually exist. Accordingly, the district court did not err in considering the loss attributable to Kalaycioglu as an issue separate from the loss attributable to his co-defendants and calculating that loss as greater than $40,000,000.

*ii. Restitution*

Restitution in this case was required by the Mandatory Victims Restitution Act. 18 U.S.C. § 3663A. As here, where the offense of conviction involved as an element a scheme, conspiracy, or pattern of criminal activity, a "victim" for purposes of the Act is any person directly harmed by the defendant's conduct in the course of the scheme, conspiracy, or pattern. § 3663A(c)(1)(B); United States v. Hasson, 333 F.3d 1264, 1275-76 (11th Cir. 2003). The district court is required to order restitution "in the full amount of each victim's losses," and the court must resolve disputes over the amount of the restitution by a preponderance of evidence. See 18 U.S.C. § 3664(e) & (f)(1)(A); Hasson, 333 F.3d at 1276. In determining the appropriate amount of restitution, the district court may consider hearsay evidence that bears "minimal indicia of reliability" so long as the defendant is given an opportunity to refute that evidence. See Bourne, 130 F.3d at 1447. To establish that evidence lacks the "minimal indicia of reliability," the defendant must establish: "(1) that the challenged

19

evidence is materially false; and (2) that it actually served as a basis for the sentence." Id. (quoting United States v. Hairston, 888 F.2d 1349, 1353 (11th Cir. 1989)).

As part of his sentence, the district court ordered that Kalaycioglu pay $6,722,592.29 in restitution, which included $1,420,000.00 to Geoffrey Horne and $600,000.00 to Stephen Renaud. The transactions involving Horne and Renaud were not the subject of charges in the superceding indictment, and Horne and Renaud did not testify at trial. Instead, the Government presented the affidavits of Horne and Renaud, as well as the hearsay testimony of an FBI Special Agent based on his interviews with them and his review of documents that substantiated their transactions and resulting losses. Kalaycioglu did not dispute the underlying transactions, but attempted to establish that he had sent Horne and Renaud funds in an amount that would vitiate the need for restitution.

Kalaycioglu asserts that the district court abused its discretion in assessing restitution for Horne and Renaud because the evidence presented was not sufficiently reliable for the Government to meet its burden by a preponderance of the evidence. Further, Kalaycioglu argues that he was prevented from refuting the evidence relating to Horne and Renaud, because Horne was not made available for cross-examination, and although Renaud was made available via telephone for cross-examination, Kalaycioglu's counsel's decision to forgo cross-examination due to a scheduling

conflict did not operate as an effective waiver of Kalaycioglu's Sixth Amendment right to confrontation.

We find that the district court did not err by relying upon the evidence presented by the Government and ordering Kalaycioglu to pay $2,020,000.00 in restitution to Horne and Renaud.[8] While the FBI Special Agent's hearsay testimony served as the basis for the order of restitution to Renaud and Horne, Kalaycioglu has failed to establish that the hearsay testimony was materially false or otherwise lacking minimal indicia of reliability. Kalaycioglu did not rebut the hearsay testimony of the FBI Special Agent, and the affidavits of Horne and Renaud supported the Agent's testimony. To the extent that Kalaycioglu argues that his counsel was ineffective for declining to cross-examine Renaud due to a scheduling conflict, that issue is not properly before the Court. See United States v. McLean, 138 F.3d 1398, 1406 (11th Cir. 1998).

However, although the district court's oral judgment correctly awarded restitution to Renaud, the written judgment incorrectly included only the victims listed in the Pre-sentence Investigation Report. Renaud is not identified as a victim

---

[8] See United States v. Dickerson, 370 F.3d 1330, 1342 (11th Cir. 2004) ("[W]e hold that where a defendant is convicted of a crime of which a scheme is an element, the district court must, under 18 U.S.C. § 3663A, order the defendant to pay restitution to all victims for the losses they suffered from the defendant's conduct in the course of the scheme.").

in that Report.  Accordingly, a limited remand is necessary to allow the district court to correct the amended judgment to include Renaud in the restitution order.[9]

### iii. U.S.S.G. § 2F1.1(b)(4)(A)

Under U.S.S.G. § 2F1.1(b)(4)(A) (2000), a defendant's offense level should be increased by two levels "[i]f the offense involved . . . a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency."  The background to the commentary relating to this provision makes clear that the "guideline is designed to apply to a wide variety of fraud cases."  U.S.S.G. § 2F1.1 comment. (backg'd).

According to the testimony presented at trial, Kalaycioglu represented to various investors that he was one of only seven persons in the world that was licensed by the Federal Reserve to engage in a high-yield investment program.  Kalaycioglu also informed at least one investor that the Federal Reserve asked him to do humanitarian projects on its behalf and told another investor that he could also participate in these humanitarian programs.  Kalaycioglu has offered no authority to support his proposition that the Federal Reserve is not a governmental organization so that his representations about being a Federal Reserve trader should not qualify for

---

[9] See United States v. Portillo, 363 F.3d 1161, 1164-65 (11th Cir. 2004) ("Where a sentence that is pronounced orally and unambiguously conflicts with the written order of judgment, the oral pronouncement controls."); United States v. Bates, 213 F.3d 1336, 1340 (11th Cir. 2000) (same).

22

a § 2F1.1(b)(4)(A) enhancement. Furthermore, Kalaycioglu represented to some investors that he handled financing matters for the Canadian government, or the Canadian military. As evidence of his government affiliation, Kalaycioglu presented potential investors a copy of an identification card issued by the Canadian government and an American Express card issued in his name by the Canadian government. Representations that Kalaycioglu acted on behalf of a foreign government could alone qualify him for a § 2F1.1(b)(4)(A) enhancement. See United States v. Achiekwelu, 112 F.3d 747 (4th Cir. 1997); United States v. Ferrera, 107 F.3d 537 (7th Cir. 1997).

The district court did not err in enhancing Kalaycioglu's sentence for misrepresenting that he was acting on behalf of a government agency.

### iv. *Booker* Issues

Because Kalaycioglu did not raise a Booker claim at his sentencing hearing, we review his claim only for plain error. See United States v. Dowling, 403 F.3d 1242, 1246-47 (11th Cir.), cert. denied, 126 S.Ct. 462 (2005). Under a plain error analysis, a defendant must show "(1) error, (2) that is plain, and (3) that affects substantial rights." Id. at 1247 (quotations omitted). If the defendant is able to make a showing of all three conditions, we then may exercise our discretion to notice the error if it "seriously affects the fairness, integrity, or public reputation of judicial

23

proceedings." Id. (quotations omitted). We have held that, in the context of Booker error, the plain error test is satisfied only when the defendant can show that "there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of a binding fashion." Id. (quotation omitted); see also United States v. Fields, 408 F.3d 1356, 1360-61 (11th Cir.) (explaining that a sentence at the low end of the Guidelines range does not necessarily indicate that the district court would have sentenced the defendant outside of the Guidelines if the court considered the Guidelines as advisory), cert. denied, 126 S. Ct. 221 (2005).

In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 17 L. Ed. 2d 435 (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In Blakely v. Washington, 542 U.S. 296, 304, 124 S. Ct. 2531, 2538, 159 L. Ed. 2d 403 (2004), the Supreme Court, examining the state of Washington's sentencing guidelines, held that the imposition of a sentencing enhancement must be supported by facts that were either admitted by the defendant or found by a jury beyond a reasonable doubt. In Booker, the Supreme Court extended the reasoning of Blakely to the federal Sentencing Guidelines, concluding that the mandatory nature of the Sentencing Guidelines rendered them incompatible with the Sixth

Amendment's guarantee to the right to a jury trial. Booker, 543 U.S. at 231-35, 125 S. Ct. at 749-51. The Supreme Court concluded that, to preserve Congress's intent in enacting the Sentencing Reform Act of 1984, two specific sections of the Act must be excised – 18 U.S.C. § 3553(b)(1) (requiring a sentence within the Guideline range, absent a departure) and 18 U.S.C. § 3742(e) (establishing standards of review on appeal, including de novo review of departures from the applicable Guideline range) – thereby effectively rendering the Guidelines advisory only. Id. at 259, 125 S. Ct. at 764.

Based on the Supreme Court's holding in Booker, we have stated that there can be two types of Booker errors: (1) a Sixth Amendment, constitutional, error – the error of imposing a sentencing enhancement based on judicial findings that go beyond the facts admitted by the defendant or found by the jury; and (2) a statutory error – the error of being sentenced under a mandatory Guidelines system. See United States v. Shelton, 400 F.3d 1325, 1329-31 (11th Cir. 2005).

In this case, it is likely that Kalaycioglu could meet the first two prongs of the plain error test because his sentencing hearing took place in April 2004 under a mandatory Guidelines scheme. Nevertheless, although Kalaycioglu received a sentence at the bottom of his Guidelines range, because Kalaycioglu has not shown – and the record does not indicate – that he would have received a different sentence

25

if the district court had applied the Guidelines in an advisory instead of a mandatory manner, we conclude that Kalaycioglu's substantial rights were not affected by the court's treatment of the Guidelines as mandatory. See Dowling, 403 F.3d at 1247; Fields, 408 F.3d at 1360-61. Instead, the record shows that the district court specifically considered the factors provided at 18 U.S.C. § 3553(a) and concluded that Kalaycioglu's 324-month sentence was appropriate given those factors. See United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005) (explaining that, in sentencing a defendant after Booker, district courts must correctly calculate a defendant's Guideline imprisonment range and consult the § 3553(a) factors). Thus, Kalaycioglu cannot satisfy the third prong of the plain error test and there was no Booker error in this case. See Dowling, 403 F.3d at 1247.

## Conclusion

The judgment of the district court, including both the conviction and sentence of Kalaycioglu, is AFFIRMED, except that the district court is directed to correct and reenter the amended judgment as specified in this opinion.